**Nos. 22-2211 (L) & 22-2236**

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. 22-2211

SIMPLY WIRELESS, INC.,

*Plaintiff-Appellant,*

*v.*

T-MOBILE US, INC., F/K/A T-MOBILE USA, INC., T-MOBILE USA, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court for the Eastern District of
Virginia in Case No. 1:21-cv-00597-AJT-JFA, Judge Anthony John Trenga

No. 22-2236

SIMPLY WIRELESS, INC.,

*Plaintiff-Appellant,*

*v.*

T-MOBILE US, INC., F/K/A T-MOBILE USA, INC., T-MOBILE USA, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court for the Eastern District of
Virginia in Case No. 1:21-cv-00597-AJT-JFA, Judge Anthony John Trenga

**NON-CONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLEES T-MOBILE US, INC., F/K/A T-MOBILE USA, INC., T-MOBILE USA, INC.**

BRITTANY BLUEITT AMADI
JOSS BERTEAUD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

GIDEON A. HANFT
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

JOSEPH J. MUELLER
MICHAELA P. SEWALL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

June 13, 2023        *Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

1.      **Is party/amicus a publicly held corporation or other publicly held entity?**

Yes.

2.      **Does party/amicus have any parent corporations?**  Yes.

T-Mobile USA, Inc. states that it is a subsidiary of T-Mobile US, Inc. (NASDAQ: TMUS).  T-Mobile US, Inc. is a publicly-traded company listed on the NASDAQ Global Select Market of NASDAQ Stock Market LLC ("NASDAQ"). Deutsche Telekom Holding B.V., a limited liability company (besloten vennootschap met beperkte aansprakelijkheidraies) organized and existing under the laws of the Netherlands ("DT B.V."), owns more than 10% of the shares of T-Mobile US, Inc.

DT B.V. is a direct wholly-owned subsidiary of T-Mobile Global Holding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Holding").  Holding, is in turn a direct wholly-owned subsidiary of TMobile Global Zwischenholding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Global").  Global is a direct wholly-owned subsidiary of Deutsche Telekom AG, an Aktiengesellschaft organized and existing under the laws of the Federal Republic of Germany ("Deutsche Telekom").  The principal trading market for Deutsche Telekom's ordinary shares is the trading platform "Xetra" of Deutsche Börse AG.  Deutsche Telekom's ordinary shares also trade on the Frankfurt, Berlin, Düsseldorf, Hamburg, Hannover, München and Stuttgart stock exchanges in Germany.  Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share, trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: "DTEGY").

3.      **Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?**  Yes.

T-Mobile USA, Inc. states that it is a subsidiary of T-Mobile US, Inc. (NASDAQ: TMUS).  T-Mobile US, Inc. is a publicly-traded company listed on the NASDAQ Global Select Market of NASDAQ Stock Market LLC ("NASDAQ"). Deutsche Telekom Holding B.V., a limited liability company (besloten vennootschap met beperkte aansprakelijkheidraies) organized and existing under the laws of the Netherlands ("DT B.V."), owns more than 10% of the shares of T-Mobile US, Inc.

- i -

DT B.V. is a direct wholly-owned subsidiary of T-Mobile Global Holding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Holding"). Holding, is in turn a direct wholly-owned subsidiary of TMobile Global Zwischenholding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Global"). Global is a direct wholly-owned subsidiary of Deutsche Telekom AG, an Aktiengesellschaft organized and existing under the laws of the Federal Republic of Germany ("Deutsche Telekom"). The principal trading market for Deutsche Telekom's ordinary shares is the trading platform "Xetra" of Deutsche Börse AG. Deutsche Telekom's ordinary shares also trade on the Frankfurt, Berlin, Düsseldorf, Hamburg, Hannover, München and Stuttgart stock exchanges in Germany. Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share, trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: "DTEGY").

**4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?**

No.

**5.    Is party a trade association? (amici curiae do not complete this question)**

No.

**6.    Does this case arise out of a bankruptcy proceeding?**

No.

**7.    Is this a criminal case in which there was an organizational victim?**

No.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ...........................................................................................1

STATEMENT OF THE ISSUES....................................................................4

STATEMENT OF THE CASE.......................................................................4

    A.    Simply Wireless's Sporadic And Inconsistent Use Of
         "Simply Prepaid" Prior To June 2014....................................................4

    B.    T-Mobile's Use Of "Simply Prepaid" Beginning In June
         2014 And Simply Wireless's Reactionary Attempts To
         Use "Simply Prepaid" ...........................................................................14

    C.    Procedural History...............................................................................17

    D.    The District Court's Summary Judgment Decision ...........................20

SUMMARY OF THE ARGUMENT ....................................................23

ARGUMENT ...............................................................................................26

I.    STANDARD OF REVIEW...............................................................................26

II.   THE DISTRICT COURT CORRECTLY HELD THAT SIMPLY
     WIRELESS ABANDONED ANY COMMON LAW RIGHTS IT MAY
     HAVE ACQUIRED IN "SIMPLY PREPAID." .......................................................27

    A.    Simply Wireless's Cited Evidence Is Insufficient To
         Raise A Dispute Of Fact On Its Intent To Resume Use
         During The Three-Year Statutory Period...........................................28

1.     Steven Qureshi's uncorroborated and conclusory representation that Simply Wireless intended to resume use is insufficient to create a dispute of fact. ........................................................................29

2.     Simply Wireless's sporadic and transitory sales in 2012 and 2013 are insufficient to create a dispute of fact regarding intent to resume use between 2009 and 2011. .........................................................37

3.     Simply Wireless's alleged use in 2014 and later is insufficient to create a dispute of fact regarding intent to resume use between 2009 and 2011. .........................42

B.     There Is No Dispute That Simply Wireless's Sporadic And Transitory Sales Between July 31, 2012 and April 25, 2013 Failed To Re-Establish Common Law Rights To "Simply Prepaid." .........................................................44

III.     THE DISTRICT COURT'S JUDGEMENT CAN ALTERNATIVELY BE AFFIRMED BECAUSE SIMPLY WIRELESS CANNOT ESTABLISH COMMON LAW OWNERSHIP OF "SIMPLY PREPAID." ......................................47

CONCLUSION .........................................................................59

STATEMENT REGARDING ORAL ARGUMENT ............................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Airs Aromatics LLC v. Victoria's Secret Stores Brand Management, Inc.*,
  744 F.3d 595 (9th Cir. 2014) .......................................................48, 52

*Aycock Engineering, Inc. v. Airflite, Inc.*,
  560 F.3d 1350 (Fed. Cir. 2009) ...........................................................46

*B.R. Baker & Co. v. Lebow Brothers*,
  150 F.2d 580 (C.C.P.A. 1945) .......................................................33, 35

*Blue Bell, Inc. v. Farah Manufacturing Co.*,
  508 F.2d 1260 (5th Cir. 1975) ......................................... 46-47, 48, 49

*CareFirst of Maryland, Inc. v. First Care, P.C.*,
  434 F.3d 263 (4th Cir.2006) ................................................................26

*Casual Corner Associates, Inc. v. Casual Stores of Nevada, Inc.*,
  493 F.2d 709 (9th Cir. 1974) .......................................................52, 57

*Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*,
  892 F.2d 1021 (Fed. Cir. 1989) ...........................................................38

*Cervejaria Petropolis SA v. Ambev S.A.*,
  787 F. App'x 727 (Fed. Cir. 2019) ......................................................38

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
  921 F.2d 467 (3d Cir. 1990) .........................................................46, 59

*Commerce National Insurance Services, Inc. v. Commerce Insurance
  Agency, Inc.*,
  214 F.3d 432 (3d Cir. 2000) ................................................................48

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
  601 F.3d 1387 (Fed. Cir. 2010) ....................................................37, 39

*Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*,
  458 F.3d 931 (9th Cir. 2006) ...............................................................41

*Emergency One, Inc. v. American Fire Eagle Engine Co.*,
    332 F.3d 264 (4th Cir. 2003) ...........................................47, 50, 52, 54

*Emergency One, Inc. v. American FireEagle, Ltd.*,
    228 F.3d 531 (4th Cir. 2000) ...................................................*passim*

*Evans v. Technologies Applications & Service Co.*,
    80 F.3d 954 (4th Cir.1996) ...............................................................26

*Exxon Corp. v. Humble Exploration Co.*,
    695 F.2d 96 (5th Cir. 1983) ..............................................................40

*George Co. LLC v. Imagination Entertainment Ltd.*,
    575 F.3d 383 (4th Cir. 2009) ............................................................55

*Gray v. Spillman*,
    925 F.2d 90 (4th Cir. 1991) ..............................................................37

*GSH Trademarks Limited v. Sia "Baltmark Invest"*,
    No. 1:20-cv-0271, 2021 WL 1999791 (E.D. Va. May 18, 2021) ..........32, 33, 39

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*,
    2:12-cv-00560–MMD, 2014 WL 1305144 (D. Nev. Mar. 31, 2014) ..........51, 55

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*,
    931 F.2d 1100 (6th Cir. 1991) ...........................................................54

*Imperial Tobacco Ltd., Assignee of Imperial Group PLC v. Philip
Morris, Inc.*,
    899 F.2d 1575 (Fed. Cir. 1990) ......................................21, 26, 30, 31

*International Healthcare Exchange, Inc. v. Global Healthcare
Exchange, LLC*,
    470 F. Supp. 2d 365 (S.D.N.Y. 2007) ...............................................52

*Jacobs v. North Carolina Administrative Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015) ............................................................37

*Kars 4 Kids Inc. v. America Can!*,
    8 F.4th 209 (3d Cir. 2021) ................................................................48

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
    495 F.2d 1265 (2d Cir. 1974) ......................................40, 46, 48, 56

*Larsen v. Terk Technologies Corp.*,
    151 F.3d 140 (4th Cir. 1998) ........................................................................*passim*

*Linville v. Rivard*,
    26 U.S.P.Q.2d 1508 (T.T.A.B. 1993) ................................................................32

*Lovett v. Cracker Barrell Old Country Store, Inc.*,
    700 F. App'x 209 (4th Cir. 2017) ....................................................................30

*Lucent Information Management, Inc. v. Lucent Technologies, Inc.*,
    986 F. Supp. 253 (D. Del. 1997) ......................................................................51

*McDonald's Corp. v. Burger King Corp.*,
    107 F. Supp. 2d 787 (E.D. Mich. 2000) .....................................................52, 56

*Natural Footwear, Ltd. v. Hart, Schaffner & Marx*,
    760 F.2d 1383 (3rd Cir. 1985) .........................................................................46

*Ogden v. Cozumel, Inc.*,
    No. A-18-CV-00358-LY, 2019 WL 4144324 (W.D. Tex. Aug. 29, 2019) .......44

*Pado, Inc. v. SG Trademark Holding, Co.*,
    527 F. Supp. 3d 332 (E.D.N.Y. 2021) .......................................................32, 42

*Radiance Foundation, Inc. v. N.A.A.C.P.*,
    786 F.3d 316 (4th Cir. 2015) ...........................................................................43

*Rivard v. Linville*,
    11 F.3d 1074, 1993 WL 472795 (Fed. Cir. 1993) (unpublished
    table decision) ..................................................................................................31

*Schreiber v. Dunabin*,
    938 F. Supp. 2d 587 (E.D. Va. 2013) ..............................................................43

*Silverman v. CBS Inc.*,
    870 F.2d 40 (2d Cir. 1989) ..............................................................................40

*Simply Wireless, Inc v. T-Mobile US, Inc.*,
    877 F.3d 522 (4th Cir. 2017) .....................................................................17, 18

*Sloan v. Auditron Electronic Corp.*,
    68 F. App'x 386 (4th Cir. 2003) ......................................................................26

*Spartan Food Systems, Inc. v. HFS Corp.*,
   813 F.2d 1279 (4th Cir. 1987) ............................................................58

*Specht v. Google Inc.*,
   747 F.3d 929 (7th Cir. 2014) ........................................................27, 45

*Specht v. Google Inc.*,
   758 F. Supp. 2d 570 (N.D. Ill. 2010)................................................43

*Spin Master, Ltd. v. Zobmundo Entertainment, LLC*,
   944 F. Supp. 2d *830* (C.D. Cal. 2012) ...................................... 51-52, 57

*Stat Ltd. v. Beard Head, Inc.*,
   60 F. Supp. 3d 628 (E.D. Va. 2014) ..................................................58

*Sterling Drug, Inc. v. Knoll A.-G. Chemische Fabriken*,
   159 U.S.P.Q. 628 (T.T.A.B. 1968) ....................................................47

*Suarez-Valenzuela v. Holder*,
   714 F.3d 241 (4th Cir. 2013) ............................................................45

*Tally-Ho, Inc. v. Coast Community College District*,
   889 F.2d 1018 (11th Cir. 1989) ........................................................48

*The Hub, Inc. v. Manhattan-Ward, Inc.*,
   673 F. Supp. 770 (W.D. Va. 1987)....................................................46

*United Drug Co. v. Theodore Rectanus Co.*,
   248 U.S. 90 (1918)............................................................................49

*Watec Co., Ltd. v. Liu*,
   403 F.3d 645 (9th Cir. 2005) ............................................................48

*West Florida Seafood, Inc. v. Jet Restaurants, Inc.*,
   31 F.3d 1122 (Fed. Cir. 1994) ..........................................................55

## STATUTES

15 U.S.C.

§ 1052(d)...........................................................................55, 56

§ 1057(b)................................................................................50

§ 1065......................................................................................50

§ 1115......................................................................................50

§ 1115(b)................................................................................50

§ 1127.................................................................................27, 40

## OTHER AUTHORITIES

*Callmann on Unfair Competition, Trademarks, and Monopolies*
§ 20:7 (4th ed.)......................................................................55

4 McCarthy, J. Thomas, *McCarthy on Trademarks and Unfair
Competition* (5th ed.) ......................................................29, 45

**INTRODUCTION**

Appellant Simply Wireless, Inc. ("Simply Wireless") asserts that it owns common law trademark rights in the term "Simply Prepaid"—a term it has not used in commerce ***at all*** for over five years, since March 31, 2018, and that it never tried to register with the U.S. Patent and Trademark Office ("PTO") until October 2, 2014, ***after*** T-Mobile filed its own registration for "Simply Prepaid." Nearly fifteen years ago, in 2009, Simply Wireless's co-owners, Steven and Robert Qureshi, consciously decided to rebrand their business and completely ceased any use they may have previously made of the term "Simply Prepaid." When T-Mobile began using that term five years later in 2014, Simply Wireless briefly attempted to resurrect use of the term in order to manufacture a trademark dispute. The district court, however, correctly held that there was no genuine dispute of material fact that Simply Wireless had abandoned any rights it may have had in "Simply Prepaid."

The following facts are undisputed by Simply Wireless:

1.      Simply Wireless did not use "Simply Prepaid" at all for at least three years and seven months between 2009 and mid-2012, triggering a presumption of abandonment;

2.      For a nine-month period between July 2012 and April 2013, Simply Wireless sold a grand total of (at most) $15,546 worth of third-party branded

- 1 -

prepaid cellular devices and airtime through an obscure website known as "toptvstuff.com," purporting to use "Simply Prepaid" in only the most minimal and episodic way;

3.      Simply Wireless ceased all use of "Simply Prepaid" beginning in April 2013 and did not use the term again until after it learned of T-Mobile's use in mid-2014.  As the district court correctly summarized, "Simply Wireless used [Simply Prepaid] in only essentially nine of the approximately sixty-five months that preceded T-Mobile's first use and registration application and then only in a transitory, limited and economically marginal manner."  JA1769.

4.      Since March 31, 2018, Simply Wireless has made no commercial use of "Simply Prepaid" at all.

Despite these undisputed facts, Simply Wireless argues on appeal that the evidence it presented on summary judgment raised a genuine dispute about whether it intended to resume use of "Simply Prepaid."  But the evidence Simply Wireless cites falls far short of raising a genuine dispute on abandonment.  Indeed, evidence of an intent to resume use must speak to the mark holder's intent ***during the three-year statutory period***—here, 2009 through 2011—and must indicate an intent to resume ***bona fide*** commercial use that is not "sporadic, casual or transitory."  *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 146 (4th Cir. 1998). Simply Wireless's cited evidence does neither.  Instead, Simply Wireless relies on

- 2 -

the self-serving 2022 declaration of its co-owner, Steven Qureshi, along with its minimal, sporadic, and transitory alleged use of "Simply Prepaid" **after** the statutory presumption period. The district court correctly found this evidence insufficient to raise a dispute of fact as a matter of law, and its grant of summary judgment in T-Mobile's favor should be affirmed.

The district court's grant of summary judgment can also be affirmed on the alternative ground that Simply Wireless failed to establish common law ownership of a "Simply Prepaid" mark at the time T-Mobile first used it. Simply Wireless has never registered "Simply Prepaid" as a trademark with the PTO. As a result, it can establish rights in that term only if it can establish common law trademark rights. As courts—including this Court—have uniformly found, ownership of a common law trademark requires the alleged owner to establish that it maintained **continuous use** of the mark. *See, e.g.*, *Larsen*, 151 F.3d at 146 (use must be "deliberate and continuous, not sporadic, casual or transitory" (internal quotations omitted)). Here, there is no genuine dispute that Simply Wireless did not maintain continuous use of "Simply Prepaid" between at least 2009 and T-Mobile's first use in 2014. Accordingly, Simply Wireless cannot establish common law trademark rights in "Simply Prepaid" as a matter of law.

For all these reasons, this Court should affirm the district court's grant of summary judgment in favor of T-Mobile.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly granted summary judgment in favor of T-Mobile after concluding that Simply Wireless abandoned any rights it may have acquired in "Simply Prepaid" and failed to reestablish common law ownership over the mark prior to T-Mobile's use.

2,     Whether the district court's grant of summary judgment should be affirmed on the alternative ground that Simply Wireless failed to establish common law ownership of a "Simply Prepaid" mark at the time of T-Mobile's first use.

## STATEMENT OF THE CASE

### A.     Simply Wireless's Sporadic And Inconsistent Use Of "Simply Prepaid" Prior To June 2014

Between approximately 1997 and 2008, Appellant Simply Wireless operated several brick-and-mortar retail stores branded "SIMPLY WIRELESS," where it "offered and sold third-party cell phones and accessories," *see* JA674, and obtained two federal trademark registrations for SIMPLY WIRELESS.  JA70-73.  However, this appeal does not concern the SIMPLY WIRELESS marks.  Instead, it concerns rights to a different, ***unregistered*** mark for "Simply Prepaid," *see* JA2051-2052, which Simply Wireless used only sporadically (if at all) before 2009 and stopped using entirely for more than three years thereafter, as discussed below.

***2002-2008.***  Simply Wireless claims to have begun using the "Simply Prepaid" name in 2002.  JA674.  At that time, Simply Wireless registered the

domain name www.simplyprepaid.com.  JA695; JA883.  Simply Wireless never

operated any brick-and-mortar stores under the name "Simply Prepaid."  *See*

JA1990.  Apart from registering the domain name, the scope of Simply Wireless's

use of "Simply Prepaid" is entirely unclear, as Simply Wireless failed to provide

documentation of its use at particular points in time.  Instead, before the district

court, Simply Wireless relied almost exclusively on a summary spreadsheet

purporting to set forth the sales and advertising expenses for "Simply Prepaid"

(JA3369) prepared by one of its employees during the litigation.  *See* JA2053

(indicating that the spreadsheet was prepared by "Nate McGrath … our director of

strategy"); JA2898-2899.[1]

　　Although the summary spreadsheet purports to report sales made through the

www.simplyprepaid.com website (*see* JA3369), there is no record evidence

documenting whether or how "Simply Prepaid" was actually used in connection

with any such sales.  *See* JA2898-2899 (refusing to provide documentation of

"Simply Prepaid" use between 2002 and 2008 despite T-Mobile's repeated

---

[1] Simply Wireless cites (Br. 4, 7, 12, 14-15) a different spreadsheet.  *See* JA695.
But that spreadsheet is merely a truncated version of the complete spreadsheet
(located at JA3369) that misleadingly groups together the sales and advertising
data for each of Simply Wireless's purported sub-brands under a single "Simply
Wireless" column.

requests).[2]  And although Simply Wireless identifies a "representative screenshot"
purportedly illustrating "the homepage of SimplyPrepaid.com as it existed in
2008" (Br. 4), that screen shot is a recreation from *2015* that was displayed on an
internal Simply Wireless server.  *See* JA686-693; *see also* JA791 (image of
website depicted in Simply Wireless's brief (at 6) dated ***March 2, 2015***).

There is also no record evidence indicating when Simply Wireless made its
last sale through www.simplyprepaid.com, as the summary spreadsheet provides
only cumulative annual sales and does not indicate ***when*** in 2008 any sales ceased.
*See* JA3369.  Nor is there record evidence to establish that sales purportedly made
through www.simplyprepaid.com were actually made using a "Simply Prepaid"
mark, or to establish ***where*** any of these sales were made.  Indeed, the Domain
Report produced by Simply Wireless for www.simplyprepaid.com (s*ee* JA2138-
2232) showed ***no im*ages** for February 20, 2008 and earlier.

---

[2] Although Simply Wireless points (Br. 5-6) to a letter purportedly directing
customers to www.simplyprepaid.com to refill minutes, there is no indication in
the record that the letter was ever provided to a customer or, if so, when, as it is
undated.  *See* JA782.  In any event, to the extent the letter evinces use of a mark, it
would be ***SIMPLY WIRELESS***, which appears in large letters at the top with a ®
trademark symbol.  *Id.*

JA2220; *see also* JA2221 (showing the same for February 3, 2000).  Moreover, the

www.simplyprepaid.com website marketed products and services under a different

name—"Prepaid Refills"—for at least part of 2002-2008, as shown below.

JA868; JA2219; *see also* JA2750 (trademark investigation report indicating that www.simplyprepaid.com historically redirected to another website, www.prepaidrefills.com).[3]

***2009-2012.*** In 2009, Simply Wireless signed a contract with Sprint to become an exclusive distributor of Sprint Products. *See* JA2027-2031. Under the agreement, Simply Wireless agreed to close ***all*** of its SIMPLY WIRELESS-branded retail stores or to rebrand those stores to "MOBILE NOW." *See* JA2030-2031; *see also* JA674. As a result, Simply Wireless ultimately did close or rebrand all of its SIMPLY WIRELESS brick-and-mortar retail stores, and ceased all retail sales using the SIMPLY WIRELESS mark. *See* JA2031 (noting that Simply Wireless "didn't use [the SIMPLY WIRELESS mark] in retail"); JA2271-2298 (showing inactive simplywireless.com website from 2009 to 2015).

As of 2009, Simply Wireless also deactivated and ceased making sales through www.simplyprepaid.com. *See* JA676(¶ 10) (Steven Qureshi claiming that Simply Wireless "paused" its use of www.simplyprepaid.com starting in 2009), JA3369 (showing no sales through www.simplyprepaid.com between 2009 and

---

[3] The summary spreadsheet relied upon by Simply Wireless does not identify sales made under the "Prepaid Refills" name or account for the fact that www.simplyprepaid.com marketed products under the name "Prepaid Refills." *See* JA3369.

2015).



JA866; JA2203; *see also* JA852-865 (showing inactive simplyprepaid.com website

from 2012 to August 2014); JA2137-2232 (showing complete domain history of

simplyprepaid.com with last screenshot of active website prior to 2014 dated to

July 31, 2009 and showing "Prepaid Refills" landing page); JA3616-3623

(indicating that, as of February 2015, Simply Wireless was only "able to restore the

2008 version of simplyprepaid.com"); JA1773 (district court noting as an

undisputed fact that "Simply Wireless left the simply prepaid website inactive from

at least 2009 (when Simply Wireless rebranded its physical stores to Mobile Now)

until mid-August 2014").  Along with the complete rebranding of SIMPLY

WIRELESS brick-and-mortar retail stores into MOBILE NOW stores, Simply

Wireless also adopted new branding for its non-brick-and-mortar channels of trade.

*See* JA2056-2059; JA3369.  As Steven Qureshi explained, Simply Wireless

- 9 -

adopted the names Wireless Partners North, Wireless Partners South, Wireless

Partners Southeast, and Wireless Partners Midwest for sale of products through

QVC, HSN, and other third-party sellers.  *See* JA2059-2060.

The www.simplyprepaid.com website remained inactive through at least

August 14, 2014.  *See* JA852.[4]  It is undisputed that from at least 2009 to July

2012—a period of at least three years and seven months—Simply Wireless did not

make ***any*** use of "Simply Prepaid" or spend a single dollar on the name.  *See*

JA3369.  In contrast, during that time, Simply Wireless generated more than $160

million in sales through its MOBILE NOW retail stores and partnership with

Sprint, as illustrated in the chart below which is derived from Simply Wireless's

own summary spreadsheet.  *See* JA695; JA3369.

---

[3] Simply Wireless suggests the district court found that its use of "Simply Prepaid"
ceased due to "an 'industry-wide shift in the market away from prepaid airtime for
mobile phones.'"  Br. 7 (quoting JA1769).  But the district court was merely
describing ***Simply Wireless's assertion***, not endorsing it.  JA1773.  Indeed, Simply
Wireless's post-hoc rationale for ceasing use of "Simply Prepaid" is not only
undermined by its decision to enter an exclusive partnership with Sprint, but also
by the fact that it continued operating www.prepaidrefills.com for refilling prepaid
airtime even ***after*** deactivating www.simplyprepaid.com, *see* JA2036.

JA638 (depicting data derived from JA3369 in graphical form).

There is no contemporaneous evidence in the record that Simply Wireless *intended to* make any use of "Simply Prepaid" between 2009 and July 2012, following deactivation of www.simplyprepaid.com. There is not a single document in the record from 2009, 2010, 2011, or the first half of 2012 that even mentions "Simply Prepaid." Although there is a single, two-sentence email from a representative of third party, Ignite Media Solutions ("Ignite Media") to Steven Qureshi dated January 2011, which attached a slide presentation, nothing in that email or the attached presentation relates in any way to "Simply Prepaid." *See* JA903-914. Indeed, every page of the presentation is stamped with the ***SIMPLY WIRELESS*** mark. *Id.* There is also no record evidence that there were ***any***

further communications between Simply Wireless and Ignite Media *at all* for the remaining eleven months of 2011.

*July 2012 to June 2014.* On July 16, 2012, Ignite Media proposed an agreement with Simply Wireless under which it would sell products through the website www.toptvstuff.com. JA897-901. Nothing in the record indicates that the July 2012 proposed agreement related in any way to the presentation sent to Simply Wireless 19 months earlier. Although Ignite Media proposed an "initial testing budget" for advertising in August 2012 of $50,000 split between the two companies, JA928; JA930, contrary to Simply Wireless's suggestion (Br. 12), Simply Wireless spent no money on advertising "Simply Prepaid," as confirmed by both Simply Wireless's summary spreadsheet, *see* JA3369, and Steven Qureshi's deposition testimony, *see* JA2066.

Although Simply Wireless claims that sales on the toptvstuff.com website were made using "Simply Prepaid," there is no record evidence showing how goods and services were marked and sold on www.toptvstuff.com, or where "Simply Prepaid" was actually used on the website in connection with such sales. *See* JA2898-2899. Although Simply Wireless points to what it calls "representative examples" of how "Simply Prepaid" was used in connection with the toptvstuff.com sales (Br. 11), none of the images it cites are dated or captured from the actual www.toptvstuff.com webpage, making it impossible to verify

them.[5]  *See* JA918-926.  And even assuming those images were displayed at some point in time, they confirm that "Simply Prepaid" was used in only the most minimal way.  *See, e.g.*, Simply Wireless Br. 11 (showing image with "Simply Prepaid" in tiny print at the top right-hand corner).  Indeed, Simply Wireless's own sales records indicate that the products sold through www.toptvstuff.com were third-party-branded prepaid cellular devices and airtime (e.g., LG, Motorola, Net10, Samsung).  *See* JA1682-1683; JA3378-3430.  None of these products were branded "Simply Prepaid."  *Id*.[6]

Simply Wireless's partnership with Ignite Media generated—at most—$14,669 in sales between July 31, 2012 and December 31, 2012, and $877 in sales between January 1, 2013 and April 25, 2013, for a total of $15,546 through www.toptvstuff.com in the nine months between July 31, 2012 and April 25, 2013.  JA3369.  The $15,546 in sales involved less than 300 transactions, with sales to

---

[5] Notably, these images were JPEG attachments to an email from a business partner on ***November 17, 2021,*** and described in inadmissible hearsay as "some of the ads we built."  *See* JA3808.

[6] Simply Wireless's assertion (Br. 12) that "emails and other promotional materials displaying the SIMPLY PREPAID mark reached approximately 500,000 consumers across the county" is misleading at best.  The only evidence Simply Wireless produced to support this alleged fact is inadmissible hearsay from a business partner dated ***the same day as Steven Qureshi's deposition*** and nearly a decade after the toptvstuff.com sales, without reference to a specific timeframe, location, or campaign.  *See* JA3808.

fewer than 10 customers in most states and no sales in multiple states.  *Id.*; *see also* JA1701.

Following the last sale through www.toptvstuff.com on April 25, 2013, Simply Wireless again completely ceased all use of "Simply Prepaid."  *See* JA3369.  At the same time that it again ceased use of "Simply Prepaid," the "Mobile Now" franchise with Sprint continued, generating hundreds of millions in revenue.  *See* JA3369; *see also supra* p. 10-11.  That partnership continued for nearly ten years until 2019, when Sprint terminated the relationship due to fraud committed by Simply Wireless.  *See* JA164; *see also* JA3473 ███████████

████████████████████████████████████████

███████████████

**B.     T-Mobile's Use Of "Simply Prepaid" Beginning In June 2014 And Simply Wireless's Reactionary Attempts To Use "Simply Prepaid"**

Beginning in February 2014, T-Mobile engaged consultants and conducted consumer research to identify a name for a new brand of brick-and-mortar retail stores for prepaid products and services.  *See* JA1182-1208.  Based on that research, T-Mobile tentatively settled on "Simply Prepaid" as the name for its new prepaid retail stores, *see* JA2354-2374; JA2376-2381; JA2739; JA2741-2748, and then conducted a trademark clearance search for "Simply Prepaid" to determine whether that name was being used in commerce, *see* JA2491-2724.

- 14 -

In June 2014, after the clearance search showed no use of "Simply Prepaid" in the market, T-Mobile launched its first brick-and-mortar retail stores under the "Simply Prepaid" name, *see* JA2960.



JA91.  T-Mobile also applied for a trademark registration for "Simply Prepaid" with the PTO on August 13, 2014.  *See* JA2388-2450.

Simply Wireless became aware of T-Mobile's use of "Simply Prepaid" in August 2014, *see* Simply Wireless Br. 13 (citing JA682), and subsequently began using "Simply Prepaid" in various ways in an attempt to manufacture a trademark claim against T-Mobile.[7]  Approximately two months after learning of T-Mobile's

---

[7] Following Simply Wireless's various attempts to use "Simply Prepaid," T-Mobile convened a trademark investigation into whether Simply Wireless had previously used "Simply Prepaid," which resulted in two investigation reports (in December 2014 and April 2015) showing no historical use of "Simply Prepaid" by Simply Wireless for close to a decade.  *See* JA2750-2799; JA2781-2816.

use, in October 2014, Simply Wireless filed its own trademark application for "Simply Prepaid" with the PTO. *See* JA2905-2953. Simply Wireless also attempted to reactivate the www.simplyprepaid.com website in early 2015. *See* JA686; JA2187 (indicating that, as of September 2014, the website www.simplyprepaid.com displayed a "coming soon" message). Simply Wireless also spent $25,000 sponsoring a car race in October 2014, *see* JA2066-2067; JA2001-2002; JA2346-2348, at a time when www.simplyprepaid.com remained inactive and Simply Wireless was not using "Simply Prepaid" commercially. Simply Wireless also spent $10,000 sponsoring a breast cancer charity in early 2015. *See* JA2067; JA952-953.

Between 2015 and 2018, Simply Wireless purports to have made roughly $7,000 in sales on the www.simplyprepaid.com website. *See* JA3369. Although Simply Wireless also reported $1,042,550 in sales through Amazon between 2016 and 2017, there is no record evidence establishing that those sales were made using "Simply Prepaid." *See* JA1691-1693; JA3375. Indeed, when asked if any of the products sold on Amazon used "Simply Prepaid" for products or services, Steven Qureshi responded, "I do not know." *See* JA1693; JA2070-2071.

After the final sale through www.simplyprepaid.com on March 31, 2018, Simply Wireless ceased all commercial use of "Simply Prepaid." *See* JA1715; JA3369. From 2018 through 2021, www.simplyprepaid.com remained inactive,

*see* JA1712, and Simply Wireless has acknowledged that it has made no use of

"Simply Prepaid" since at least 2019, *see* JA1716.  As shown in the chart below,

across a twenty-year period, Simply Wireless's claimed use of "Simply Prepaid"

has been inconsistent and sporadic, characterized by multi-year periods of nonuse.



JA639.

### C.    Procedural History

In October 2015, Simply Wireless brought an action in federal court

asserting, *inter alia*, infringement of common law trademark rights it claimed to

have in "Simply Prepaid" and its registered SIMPLY WIRELESS marks.  *See*

*Simply Wireless, Inc v. T-Mobile US, Inc.*, 877 F.3d 522, 525 (4th Cir. 2017).  The

district court found Simply Wireless's claims fell within an arbitration agreement

between the parties and dismissed the case without prejudice.  *See id*. at 526.  This

- 17 -

Court affirmed on the ground that the parties had agreed to delegate questions of arbitrability to an arbitrator. *See id.* at 524. The parties proceeded to arbitrate the question whether Simply Wireless's claims against T-Mobile were subject to arbitration, and the arbitrator found that the dispute was not subject to arbitration. JA58.

On May 12, 2021, Simply Wireless filed a new action in the U.S. District Court for the Eastern District of Virginia, asserting claims for, *inter alia*, infringement of common law rights it claimed to own in "Simply Prepaid" and its registered SIMPLY WIRELESS marks. *See* JA40; JA61-65.[8]

During discovery, T-Mobile repeatedly requested that Simply Wireless provide evidence showing how it had used "Simply Prepaid" over time. *See* JA2888-2896. However, Simply Wireless failed to provide any documentary evidence of its alleged use, including evidence showing the goods or services it claimed to have sold on www.simplyprepaid.com from 2002 to 2008, how goods and services were marked and sold on www.toptvstuff.com in 2012 and 2013, how products were advertised or sold on www.simplyprepaid.com between 2015 and 2018, or how products were advertised or sold on Amazon between 2015 and 2017. *See* JA2898-2899. At the conclusion of discovery, it remained impossible

---

[8] Simply Wireless ultimately voluntarily dismissed its SIMPLY WIRELESS-related claims. *See* JA36-37.

to determine whether or how (if at all) Simply Wireless had actually used "Simply Prepaid" either prior to or after T-Mobile's first use.

In January 2022, the parties filed competing summary judgment motions. *E.g.*, JA155. Among other things, T-Mobile argued that Simply Wireless had not established that it had common law rights to "Simply Prepaid" because it had not established exclusive use in any geographic area and its purported use had not been continuous. *See* JA166-170. T-Mobile further noted that, to the extent Simply Wireless had at one point established common law rights in "Simply Prepaid," it had abandoned those rights. *See* JA170 n.4.[9] In opposition to T-Mobile's motion, Simply Wireless did not dispute that it had failed to use "Simply Prepaid" for more than three consecutive years. JA551. Instead, Simply Wireless argued it had intended to resume use during that period, pointing to a March 10, 2022 declaration from its CEO and co-owner, Steven Qureshi, claiming that Simply Wireless had "never intended to abandon SIMPLY PREPAID" and "always intended to resume [its] use." JA676.

---

[9] Contrary to Simply Wireless's assertion (Br. 21), T-Mobile did not argue that "the defense of abandonment … did not apply to common law … marks." Instead, T-Mobile argued that given Simply Wireless's failure to establish common law ownership, there was no need to reach the issue of abandonment. *See* JA608-610. However, T-Mobile made clear that to the extent the Court addressed abandonment, the record confirmed that Simply Wireless abandoned any rights in "Simply Prepaid." *See* JA1620-1621.

The district court held a hearing on the parties' competing summary judgment motions on February 16, 2022, *see* JA543-628, during which it questioned the parties extensively regarding the interplay between abandonment and continuous use. *See*, *e.g.*, JA608-615, JA624-626. Following the hearing, the district court requested supplemental argument and provided the parties with a list of ten issues on which it requested further argument, with a particular focus on abandonment. *See* JA34; JA1672-1718 (showing the questions posed by the court). The Court held a further hearing on April 16, 2022. *See* JA1669-1671.

**D.    The District Court's Summary Judgment Decision**

On October 24, 2022, the district court issued a 30-page decision granting summary judgment in T-Mobile's favor on Simply Wireless's "Simply Prepaid"-related trademark infringement claims. *See* JA1769-1798, JA3810-3839. The district court began its analysis by noting that, in its view, "an abandonment analysis, rather than a deliberate and continuous use analysis, controls." JA1771. The district court concluded that Simply Wireless had abandoned any rights it had acquired to "Simply Prepaid" due to non-use for three consecutive years beginning in 2009, had not reestablished common law rights in "Simply Prepaid" between 2012 and 2014, and therefore had no common law rights in "Simply Prepaid" at the time of T-Mobile's first use in June 2014. JA1787-1795.

- 20 -

The district court began by reciting the undisputed facts, acknowledging where facts were disputed with respect to Simply Wireless's use of "Simply Prepaid," *see* JA1772-1777, and where there were disputed facts, the district court viewed those disputed facts in the light most favorable to Simply Wireless, *see* JA1779.

The district court also observed that a number of critical facts were undisputed. Specifically, the court noted that it was undisputed Simply Wireless did not use "Simply Prepaid" between 2009 and mid-2012, triggering a presumption of abandonment. *See* JA1774; JA1787. "Because Simply Wireless did not use the mark for more than three years," the court determined that "it can only rebut the presumption by establishing that it had formed an intent to resume use in the reasonably foreseeable future during the three-year statutory period." JA1787. Quoting *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990), the district court observed that "a trademark owner 'cannot defeat an abandonment claim, as well as the purposes of the Lanham Act, by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date.'" JA1788. The district court then observed that Simply Wireless had pointed to three categories of information in an attempt to establish intent to resume use: (1) renewal of the simplyprepaid.com domain, (2) discussions with and later sales involving Ignite Media, and (3) Steven Qureshi's declaration.

- 21 -

JA1789-1790.  With respect to the domain name renewal, the district court

explained that the domain had "remained completely dormant from 2009 to 2014;

and merely renewing a domain name for a website without any functionality does

not sufficiently indicate an intent to resume use."  JA1790.

With respect to Steven Qureshi's declaration and the Ignite Media

communications, the district court found the evidence "vague and indefinite."

JA1790.  Specifically, it noted that the Ignite Media communications in both 2011

and 2012 contradicted Steven Qureshi's representation in his declaration that

Simply Wireless's negotiations with Ignite Media focused on the use of "Simply

Prepaid."  *See* JA1790-1791.  As the district court observed, "the referenced

communications with Ignite Media are either outside the statutory period (July

2012) or fail to mention the Mark at all (January 2011)."  JA1790.  Instead, the

very communications on which Simply Wireless had relied confirmed that

"negotiations regarding [Simply Prepaid] did not begin in earnest until well into

2012, after the presumption of abandonment had accrued."  JA1791.  The district

court also found that later evidence of use failed to suggest "an intent to resume

use formulated during the three-year statutory period."  JA1792.  Noting Simply

Wireless's sporadic use of "Simply Prepaid" over time, the court also observed that

"[i]t is also undisputed that Simply Wireless once again completely stopped using

the Mark as of 2019, having not made any sales as of March 31, 2018."  *Id*.  The

district court thus concluded that Simply Wireless had "failed as a matter of law to produce sufficient evidence that would allow a reasonable factfinder to conclude that Simply Wireless formed the intent to resume use of the SIMPLY PREPAID mark during the statutory three-year period of nonuse (2009-2011)." JA1794-1795.

"Having concluded that Simply Wireless abandoned the Mark by the very beginning of 2012—through its three years of nonuse (2009, 2010, and 2011)"—the district court turned to "the issue … [of] whether its subsequent use re-established its common law ownership." JA1795. The district court found that Simply Wireless's sporadic and minimal use of "Simply Prepaid" between 2012 and 2013 "was not the kind of continuous, uninterrupted use necessary to revive its now lost rights in the mark." *Id.* As the undisputed facts showed Simply Wireless had abandoned any rights to "Simply Prepaid" and failed to reestablish common law rights before T-Mobile's first use, the district court granted summary judgment in T-Mobile's favor.

## SUMMARY OF THE ARGUMENT

The district court correctly determined that there was no genuine dispute as to any material fact that would preclude granting summary judgment in T-Mobile's favor on Simply Wireless's trademark claims. Although Simply Wireless claimed to own common law rights in "Simply Prepaid," it made the conscious and

deliberate decision to cease commercial use of that term nearly fifteen years ago, abandoning any rights it might have had and only seeking to resurrect any such rights *after* T-Mobile's adoption and use of "Simply Prepaid."  Simply Wireless now seeks to undo the district court's well-reasoned decision by distorting the evidence and pointing to purported "facts" that have no basis in the record.  Simply Wireless's arguments should be rejected, and the district court's judgment affirmed on two separate and independent grounds.

*First*, the district court correctly held, as a matter of law, that Simply Wireless abandoned any common-law rights it may have acquired in "Simply Prepaid" when it ceased all use of the phrase for well over three consecutive years, and failed to produce any contemporaneous evidence of an intent to resume use during that three-year period.  The district court further properly concluded that Simply Wireless failed to establish any common law rights to "Simply Prepaid" after its abandonment, where the evidence established that it used the term in only the most minimal, sporadic, and fleeting way.

Contrary to Simply Wireless's assertions (Br. 27), the district court correctly concluded that the self-serving, litigation-inspired declaration of Simply Wireless's CEO and co-owner, Steven Qureshi, failed to raise a dispute of material fact sufficient to preclude summary judgment.  Not only was the declaration uncorroborated by contemporaneous documentation, but it was squarely

contradicted by the documentary record.  There is no basis for disturbing the district court's thorough and well-reasoned decision.

*Second*, the district court's judgment can alternatively be sustained on the ground that Simply Wireless failed to produce evidence sufficient to create a dispute of fact as to whether it had common law trademark rights in "Simply Prepaid" prior to T-Mobile's first use.  Where, as here, a party claims rights in an unregistered mark, that party must show that its use was "deliberate and continuous, not sporadic, casual or transitory."  *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 146 (4th Cir. 1998).  There is no genuine dispute that—even by Simply Wireless's own admission—Simply Wireless's alleged use of "Simply Prepaid" between 2002 and T-Mobile's first use in June 2014 was not "deliberate and continuous" and therefore is insufficient as a matter of law to establish common-law ownership of a "Simply Prepaid" mark.  It is undisputed that there were *years* of non-use between 2009 and June 2014, rendering Simply Wireless's purported use of "Simply Prepaid" anything but "continuous."

Because Simply Wireless is unable to establish common-law rights to "Simply Prepaid" as a matter of law, the district court's grant of summary judgment in favor of T-Mobile can also be affirmed on this alternative ground.

- 25 -

**ARGUMENT**

**I.    STANDARD OF REVIEW**

This Court reviews a district court's grant of summary judgment in a

trademark dispute *de novo*.  *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d

263, 267 (4th Cir. 2006).  Under Federal Rule of Civil Procedure 56, this Court

will affirm the grant of summary judgment where no genuine disputes of material

fact exist and the movant is entitled to judgment as a matter of law.

With respect to trademark claims, "the owner of a trademark cannot defeat

an abandonment claim … by simply asserting a vague, subjective intent to resume

use of a mark at some unspecified future date." *Emergency One, Inc. v. American

FireEagle, Ltd.* ("*Emergency One I*"), 228 F.3d 531, 537 (4th Cir. 2000).

Accordingly, to establish a genuine dispute of material fact with respect to

trademark abandonment, the non-moving party must do more than deny an

intention to abandon its mark.  *See Imperial Tobacco*, 899 F.2d at 1581.  Instead,

the nonmoving party "must put forth evidence with respect to what activities it

engaged in during the nonuse period or what outside events occurred from which

an intent to resume use during the nonuse period may reasonably be inferred." *Id;

see also Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th

Cir. 1996) (noting that conclusory affidavit cannot defeat summary judgment);

*Sloan v. Auditron Elec. Corp.*, 68 F. App'x 386, 391 (4th Cir. 2003) (affirming

summary judgment on abandonment after finding that plaintiff's "affidavits …

[were] … [an] attempt to avoid abandonment merely by asserting a vague intention

to resume use").

## II.    THE DISTRICT COURT CORRECTLY HELD THAT SIMPLY WIRELESS ABANDONED ANY COMMON LAW RIGHTS IT MAY HAVE ACQUIRED IN "SIMPLY PREPAID."

A mark is abandoned "[w]hen its use has been discontinued with intent not

to resume such use."  15 U.S.C. § 1127.  Non-use by the trademark owner "for

three consecutive years" establishes a "mandatory 'inference of intent not to

resume use,'" *Emergency One I*, 228 F.3d at 536; *see also* 15 U.S.C. § 1127

("Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.").

As Simply Wireless acknowledges (Br. 31), to defeat the presumption of

abandonment, the party asserting ownership of the mark has the burden to produce

"evidence of either [1] actual use during the relevant period or [2] intent to resume

use." *Emergency One I*, 228 F.3d at 536.  Where a mark is abandoned, "it returns

to the public domain, and may be appropriated anew."  *Specht v. Google Inc.*, 747

F.3d 929, 935 (7th Cir. 2014).

There is no dispute that Simply Wireless ceased all use of "Simply Prepaid"

for over three years between at least 2009 and mid-2012, triggering "a mandatory

inference of intent not to resume use," *Emergency One I*, 228 F.3d at 536.  *See*

Simply Wireless Br. 22; *see also* JA676 (¶ 10); JA678 (¶¶ 13-14); JA3369.[10]

Simply Wireless's sole argument for reversal is that the district court erroneously concluded that Simply Wireless failed to produce evidence sufficient to support a finding that it intended to resume use of "Simply Prepaid" within the three-year statutory window. But Simply Wireless failed to point to a single piece of evidence to corroborate its conclusory claim that it possessed—within the three-year statutory period—an intent to resume ***bona fide*** use of "Simply Prepaid" in commerce. Nor did Simply Wireless present evidence sufficient to raise a dispute of fact as to whether it acquired common law rights in "Simply Prepaid" after it had abandoned any rights it may have had. Accordingly, this Court should affirm the district court's grant of summary judgment in favor of T-Mobile.

> **A.    Simply Wireless's Cited Evidence Is Insufficient To Raise A Dispute Of Fact On Its Intent To Resume Use During The Three-Year Statutory Period.**

Simply Wireless points to evidence from three separate timeframes as purportedly raising a dispute of fact sufficient to avoid summary judgment. First, Simply Wireless points to its co-owner Steven Qureshi's 2022 declaration baldly stating that Simply Wireless intended to resume use of "Simply Prepaid" during the three-year statutory period between 2009 and 2011. Br. 7-10, 34-35, 45-46.

---

[10] As discussed above (*supra* p. 5-8) and as the district court acknowledged (JA1773 & n.7), the record is entirely unclear as to how (if at all) Simply Wireless used "Simply Prepaid" even prior to 2009.

Second, Simply Wireless points to sales made through the toptvstuff.com website between July 31, 2012 and April 25, 2013—*after the three-year period*—as evidence of its intent to resume use in *2011 or earlier*.  Br. 39-42.  Finally, Simply Wireless points to evidence from *after T-Mobile's first use in June 2014* as purported evidence of its intent to resume use nearly five years prior.  Br. 42-44, 47-48.  After fully considering this evidence, the district court found that it was insufficient to present a genuine dispute of material fact.  That decision was correct.

> **1.     Steven Qureshi's uncorroborated and conclusory representation that Simply Wireless intended to resume use is insufficient to create a dispute of fact.**

Contrary to Simply Wireless's assertions (Br. 35), the representation in Steven Qureshi's declaration that Simply Wireless always intended to resume use of "Simply Prepaid" is not "alone … sufficient to defeat summary judgment."  As this Court has explained, "the owner of a trademark cannot defeat an abandonment claim … by simply asserting a vague, subjective intent to resume use of a mark." *Emergency One I*, 228 F.3d at 537; *see also* 4 McCarthy, J. Thomas, *McCarthy on Trademarks and Unfair Competition* § 17:13 (5th ed.) ("If all a party had to do to avoid a holding of abandonment was to testify that he never had any intent to abandon the mark, or never had any intent not to resume use, then no mark would ever be held abandoned.").  Indeed, "in every contested abandonment case, the

respondent denies an intention to abandon its mark; otherwise there would be no contest." *Imperial Tobacco*, 899 F.2d at 1581. Thus, mere assertions by the mark's alleged owner that it intended to resume use are insufficient to defeat summary judgment; rather, the alleged owner "must put forth evidence with respect to what activities it engaged in ***during the nonuse period*** or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." *Id.* (emphasis added).

*Lovett v. Cracker Barrell Old Country Store*, 700 F. App'x 209, 212 (4th Cir. 2017), on which Simply Wireless relies (Br. 36-37), is not to the contrary. As an initial matter, *Lovett* involved an employee's retaliation claims under Title VII of the Civil Rights Act of 1964, in which this Court affirmed the district court's grant of summary judgment to the employer after finding that the employee's evidence—her affidavit, accompanied by a voicemail and several emails— "wouldn't allow a reasonable jury to rule in her favor." *Id.* at 214. In doing so, the Court explained that the "key question" remains "whether the non-movant has produced enough evidence to demonstrate that a dispute about a material fact is '***genuine***,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," noting that in certain circumstances an "affidavit will be insufficient to meet this standard." *Id*. at 212.

That is precisely the situation at issue here. The entirety of Mr. Qureshi's statement in his declaration regarding intent to resume use is as follows:

> Beginning in 2009, Simply Wireless decided to pause sales of prepaid airtime refills through www.simplyprepaid.com. This decision was prompted by an industry-wide shift away from prepaid refills (like the ones sold through SIMPLY PREPAID). Despite this, Simply Wireless never intended to abandon SIMPLY PREPAID. I and Simply Wireless' co-owner, my brother Robert Qureshi, always intended to resume use of the SIMPLY PREPAID trademark, continuously sought business opportunities for using SIMPLY PREPAID, and resumed its use in 2012.

JA676(¶ 10). Mr. Qureshi's statement is exactly the kind of "averment of intent not to abandon" that the *Imperial Tobacco* Court explained "is little more than a denial in a pleading, which is patently insufficient to preclude summary judgment." 899 F.2d at 1581.

As the district court explained, "Simply Wireless does not explain why or how that shift impacted its ability to use the Mark sooner or what it was doing during the three-year statutory period of non-use to determine if and how to use the Mark in the new business landscape." JA1791-1792. Moreover, contrary to Simply Wireless's assertion (Br. 37), Mr. Qureshi's declaration is not "far more specific" than that at issue in *Rivard v. Linville*, 11 F.3d 1074, 1993 WL 472795 (Fed. Cir. 1993) (unpublished table decision). In *Rivard*, the mark holder provided a declaration in which he "outlined various trips made to the United States to meet with real estate and franchise agents for the alleged purpose of opening a hair salon

using the mark"—statements that were supported by a documentary record.  *Id.* at *1; *see also Linville v. Rivard*, 26 U.S.P.Q.2d 1508, at *2-3 (T.T.A.B. 1993) (noting that mark holder had made trips every year during the statutory period, sometimes multiple times a year, and had entered into talks with several companies during those trips to set up operations in the U.S.), *rev'd*, 11 F.3d 1074 (Fed. Cir. 1993).[11]  To the contrary, here Mr. Qureshi vaguely averred nearly fifteen years later that he never intended to abandon "Simply Prepaid," without any evidence to support that claim.  The district court was thus correct in finding his declaration insufficient to raise a genuine dispute of material fact to defeat summary judgment.

Nor does *Pado, Inc. v. SG Trademark Holding, Co.*, 527 F. Supp. 3d 332 (E.D.N.Y. 2021), on which Simply Wireless also relies (Br. 30, 33), suggest that a mark holder's conclusory declaration is sufficient to defeat summary judgment.  In *Pado*, there was evidence of the mark holder's repeated, specific efforts to resume use of the mark, including by continuing to promote the mark abroad and trying to establish relationships with potential vendors in the United States, as well as by filing a patent application for the device sold using the mark.  *Id*. at 344-345.

---

[11] Similarly, in *GSH Trademarks*, the mark holder established that it had entered into a licensing agreement for use of the mark during the statutory period, and provided an invoice identifying a contract date from just a few days outside the statutory period, which corroborated that intent to resume use had been formed **before** the end of the statutory period.  2021 WL 1999791, at *5.

There is no such evidence here; indeed, the evidence is all to the contrary—Simply Wireless decided to abandon its use of all "Simply"-related marks in favor of its new (and then-lucrative) "Mobile Now" business. *See supra* p. 10-11.

Moreover, even *GSH Trademarks Limited v. Sia "Baltmark Invest"*, on which Simply Wireless relies (Br. 37), acknowledged that a declaration "characterized by contradictions, inconsistencies, and indefiniteness" is insufficient to defeat summary judgment. No. 1:20-cv-0271, 2021 WL 1999791 at *4 (E.D. Va. May 18, 2021) (quoting *B.R. Baker & Co. v. Lebow Bros.*, 150 F.2d 580, 583 (C.C.P.A. 1945)). Here, Mr. Qureshi's conclusory declaration is directly contradicted by the record. There are no contemporaneous documents reflecting that Simply Wireless "paused" its use of "Simply Prepaid" due to "an industry-wide shift away from prepaid refills," JA676, and that purported rationale is inconsistent with the fact that—as Steven Qureshi testified at his deposition— Simply Wireless maintained its www.prepaidrefills.com website for purchase of prepaid refills even as it deactivated www.simplyprepaid.com, *see* JA2036.[12] Nor is there any other record evidence to suggest that Simply Wireless "continuously

---

[12] Simply Wireless makes much of the fact that "[d]epressed market conditions" and "economic hardships" can provide a reasonable explanation for a pause in use. Br. 37-38. But there is no evidence of depressed conditions or economic hardships here. Indeed, at the same time Simply Wireless purportedly "paused" its use of "Simply Prepaid," it began generating hundreds of millions of dollars in revenue through its "Mobile Now" business. *See supra* p. 10-11.

sought business opportunities for using Simply Prepaid." JA676. In fact, the only contemporaneous documentary evidence shows Simply Wireless had a different reason for ceasing use of "Simply Prepaid": it signed a lucrative deal with Sprint in 2009 to exclusively distribute Sprint products—including *prepaid* products—under the name "Mobile Now." *See* JA1572-1573; JA2027-2031. Following that deal, Simply Wireless's sales skyrocketed to well over $100 million per year, and over $200 million in several years—*fifty times* what Simply Wireless claims to have made in its best year using "Simply Prepaid" (2005), and close to *100 times* what it purportedly made using "Simply Prepaid" in 2008, the last year before its alleged "pause." JA695; *see supra* p. 10-11.

Nor is Steven Qureshi's conclusory assertion that "in early 2011, Simply Wireless began negotiating with Ignite Media," and that "[t]hose negotiations focused on the use of the SIMPLY PREPAID mark," JA676-677, sufficient to raise a genuine dispute of material fact. The *only* document Simply Wireless points to from within the three-year statutory period is a two-sentence January 2011 email from an Ignite Media representative to Simply Wireless and attached slide deck, which makes no reference to "Simply Prepaid." *See* JA902-914. Instead, the slide deck repeatedly references *Simply Wireless*, confirming that any partnership Ignite Media may have envisioned with Simply Wireless in 2011 was for promotion of the *SIMPLY WIRELESS* mark, not "Simply Prepaid." *See, e.g.*,

JA913 (describing a "Simply Wireless New DRTV Channel" expected through partnership with Ignite Media). Steven Qureshi's representation that the "negotiations focused on the use of the SIMPLY PREPAID mark," *see* JA677, is thus directly contradicted by the very evidence Simply Wireless relies on to support it. Thus, as the district court correctly found, the single pre-2012 communication with Ignite Media simply does "not reflect a formulated intent to resume use of the Mark in the reasonably foreseeable future." JA1790.

Nor do later events establish that Simply Wireless had a "clear cut plan" to resume use of "Simply Prepaid" in 2011. Simply Wireless Br. 36. The only communications between Simply Wireless and Ignite Media that make any reference to "Simply Prepaid" occurred in the ***second half of 2012***—long after the three-year statutory window. *See* JA897-901; JA915-917; JA927-928. As the district court observed, those later communications were merely "preliminary, exploratory efforts in the nature of an experiment, to determine whether to engage in any future use," JA1791, which directly contradicts any inference of intent to resume use over seven months prior.

Reliance on the Ignite Media communications is far from the only "contradiction[], inconsistenc[y], and indefiniteness," *B.R. Baker*, 150 F.2d at 583, in Steven Qureshi's declaration. Although Mr. Qureshi asserts that "[b]eginning in 2002 and continuing through 2008, Simply Wireless offered prepaid airtime for

- 35 -

cell phones through … www.simplyprepaid.com," JA674, as discussed above

(*supra* p. 5-8), Simply Wireless's own evidence indicates that as of ***May 2008***, the

website www.simplyprepaid.com used a ***different name***, "Prepaid Refills."  *See*

JA2219; *see also* JA2750 (indicating that www.simplyprepaid.com historically

redirected to www.prepaidrefills.com).  Similarly, while Mr. Qureshi purports to

show a "representative example of the homepage … as it existed in 2008," JA674-

675 (identifying as Exhibit 1 a screenshot of the Simply Prepaid website), in fact,

the last actual screenshot Simply Wireless's documentary evidence identified for

www.simplyprepaid.com for that year—in May 2008—showed a very different

homepage using the "Prepaid Refills" name—not "Simply Prepaid", *see* JA868;

JA2219.

 

JA675; JA676.

Where, as here, there are numerous factual inconsistencies between Simply Wireless's self-serving and conclusory declaration submitted on summary judgment and the documentary record, the declaration is plainly insufficient to raise a material dispute of fact sufficient to defeat summary judgment.[13]

> ## 2. Simply Wireless's sporadic and transitory sales in 2012 and 2013 are insufficient to create a dispute of fact regarding intent to resume use between 2009 and 2011.

Simply Wireless next claims that its *de minimis* use of "Simply Prepaid" between July 2012 and April 2013 "provided a sufficient basis for a jury to infer an intent to resume use." Br. 39. But as the district court correctly found (JA1792-1793), any sporadic and fleeting later use of "Simply Prepaid" did not evince intent to resume use during the three-year statutory period.

As the district court acknowledged, "courts can 'consider evidence and testimony regarding practices that occurred before or after the three-year statutory period to infer [senior user's] intent to resume use during the three-year period.'" JA1792 (quoting *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1392 (Fed. Cir. 2010)). But such evidence must nonetheless show intent to resume use

---

[13] In contrast, none of the non-trademark cases Simply Wireless cites (Br. 36) for the proposition that self-serving statements are sufficient to defeat summary judgment involved statements directly contradicted by other evidence. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569-570 (4th Cir. 2015) (describing documentary and witness testimony that supported plaintiff's version of events); *Gray v. Spillman*, 925 F.2d 90, 92 (4th Cir. 1991) (describing affidavit by other witness supporting plaintiff's version of events).

***during the statutory period***.  For example, were a mark holder to cease all use of a mark for four years, with no evidence (e.g., development work, testing, etc.) that it intended to resume use during that period, yet suddenly in year four begin brainstorming ways to use the mark in year five, the subsequent brainstorming or use would be insufficient to establish intent to resume use during the statutory period.  *See, e.g.*, *Cervejaria Petropolis SA v. Ambev S.A.*, 787 F. App'x 727, 730 (Fed. Cir. 2019) (noting that "in the absence of evidence of intent to resume use during the period of non-use," it is appropriate to "'conclude the registrant has … failed to rebut the presumption of abandonment,' even when there is evidence of intent to resume ***after*** the period of nonuse" (emphasis added) (quoting *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1027-1028 (Fed. Cir. 1989))).

Yet that is precisely what Simply Wireless seeks to do here by pointing to evidence of alleged use that began well after the statutory period.  As the district court recognized, the evidence that Simply Wireless itself put forward as evidencing intent to resume use showed that "negotiations regarding the Mark did not begin in earnest until well into 2012, after the presumption of abandonment had accrued."  JA1791; *see also* JA897-901 (unsigned, draft agreement between Ignite Media and "Simply Wireless d/b/a/ Simply Prepaid Inc.," dated July 16, 2012); JA915-917 (August 28, 2012 email from Ignite Media to Simply Wireless

regarding customer order confirmations); JA928-929 (August 27, 2012 email from Ignite Media to Simply Wireless proposing an "initial testing budget"). This case thus stands in stark contrast to *Crash Dummy*, where the mark holder provided testimony and documents showing that it registered the mark with the PTO and entered into negotiations with a retailer for the sale of products using the mark *during the statutory period*, and that it undertook further research and development of its products once those negotiations failed, such that its resumed use of the mark after the statutory period logically corroborated the other record evidence of its intent to resume use during the period. *See* 601 F.3d at 1391-1392. Similarly, in *GSH Trademarks*, the mark holder entered into a license agreement with another company *during* the statutory period, resulting in sales through this partnership starting just a month after the end of the statutory period. 2021 WL 1999791, at *5. Here, Simply Wireless's "negotiations regarding [Simply Prepaid]" with Ignite Media "did not begin in earnest until well into 2012," *see* JA1791, confirming a *recently-established* partnership, not one ongoing for over a year.

Moreover, "[b]oth 'use' and 'intent not to resume use' have somewhat specialized meanings in the context of the Lanham Act." *Emergency One I*, 228 F.3d at 536. As Simply Wireless acknowledges, "use" under the Lanham Act means "the bona fide use of such mark made in the ordinary course of trade." Br.

- 39 -

41 (quoting 15 U.S.C. § 1127). And this Court has held that bona fide commercial use means use that is not "sporadic, casual, and transitory." *Larsen*, 151 F.3d at 146 (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271-1272 (2d Cir. 1974)); *see also, e.g.*, *Silverman v. CBS Inc.*, 870 F.2d 40, 47-48 (2d Cir. 1989) (rejecting "sporadic licensing" of mark as insufficient to avoid abandonment); *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 102 (5th Cir. 1983) (contrasting intent not to abandon a mark, which is insufficient to escape abandonment, with "intent to resume," which "requires the trademark owner to have plans to resume ***commercial*** use of the mark" (emphasis added)).

Moreover, sales between July 2012 and April 2013 at best reflect only an "intent not to abandon or relinquish" any rights in "Simply Prepaid"; they do not constitute ***bona fide*** use (or establish an intent to resume such use) under the Lanham Act. *See id.* at 100 (finding "limited sales" insufficient to show intent to resume commercial use where the mark was not "used to identify the source of the goods"). Indeed, Simply Wireless's communications with Ignite Media in the second half of 2012 show that the proposed use of the mark was experimental and geared toward testing the market. *See, e.g.*, JA928 (Aug. 20, 2012 email from Ignite Media to Simply Wireless noting sales would not be profitable). While Steven Qureshi claimed that "[d]uring the 2012-2013 period, Simply Wireless paid

$25,000 to market its goods sold on TopTVStuff.com," JA679, both Simply

Wireless's summary spreadsheet and Steven Qureshi's own deposition testimony

indicate that Simply Wireless spent no money on advertising for "Simply Prepaid"

between 2009 and 2013, *see* JA2066; JA3369.  Over the nine months that Simply

Wireless offered products for sale through toptvstuff.com, it made less than 300

sales, totaling a little over $14,500 in 2012 and less than $900 in 2013.  *See*

JA3369.  There were no sales in multiple states, and the most sales Simply

Wireless made in a single state was 30 sales in Florida.  *See id.*  The products sold

through www.toptvstuff.com were third party-branded prepaid cellular devices and

contained no "Simply Prepaid branding."  *See* JA1682-1683.  As the district court

noted (JA1792), this "sporadic, casual or transitory" use is insufficient to constitute

"use" under the Lanham Act.  *Larsen*, 151 F.3d at 146.[14]

---

[14] Simply Wireless also relies on *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931 (9th Cir. 2006), for the proposition that "[l]egitimate commercial transport or sales of trademarked goods, even for a failing business, are sufficient to defeat a claim of abandonment."  Br. 41 (quoting *Electro Source*, 458 F.3d at 933).  But in *Electro Source*, the mark holder continuously—albeit at low sales volumes—sold products bearing the mark at issue.  *Electro Source*, 458 F.3d at 934-935.  As a result, the Ninth Circuit held that it had never stopped commercial use of the mark and had not abandoned it.  *Id.* at 941.  Here, aside from sporadic sales through www.toptvstuff.com, Simply Wireless completely ceased use of "Simply Prepaid" for close to 6 years between 2009 and 2014.

### 3. Simply Wireless's alleged use in 2014 and later is insufficient to create a dispute of fact regarding intent to resume use between 2009 and 2011.

Simply Wireless's reliance on evidence from 2014 or later—years after the end of the statutory period—is equally flawed. Simply Wireless points to (1) internal communications regarding www.simplyprepaid.com in 2014, Br. 47-48, (2) sales allegedly made on Amazon and www.simplyprepaid.com between 2015 and 2017, Br. 42-43, and (3) its efforts to pursue this litigation, Br. 43. Whether viewed individually or in combination, none of these purported "facts" evince an intent to resume use formulated *during the statutory period*.

*First*, that Simply Wireless may have discussed launching www.simplyprepaid.com *in 2014, see* Simply Wireless Br. 42-43; JA679; JA933-936, says nothing about whether it held an intent to resume use two and a half years prior. *See supra* p. 29-37. Nor does Simply Wireless's "renewal of the SIMPLY PREPAID website" provide evidence of intent to resume use during the statutory period. Simply Wireless Br. 47-48. The facts in *Pado*, on which Simply Wireless relies, are readily distinguishable from those here. In *Pado*, the mark holder produced evidence of his repeated efforts to resume use in conjunction with maintaining a website, not merely the existence of an inactive website. *See* 527 F. Supp. 3d at 345. Here www.simplyprepaid.com was inactive and non-functional and did not display *anything at all* from 2009 to 2015, *see* JA866 (showing

www.simplyprepaid.com displayed an error message on March 7, 2012); JA2344 (showing a blank website as of August 16, 2014); JA3616-3623 (as of February 2015, Simply Wireless was only "able to restore the 2008 version of simplyprepaid.com"). That Simply Wireless held rights to an inactive domain is insufficient to avoid abandonment. *See, e.g.*, *Specht v. Google Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) (where a website "served as a remnant of a closed business[,] [a] 'ghost site' such as this is not a bona fide use in commerce that can prevent the abandonment of a mark"); *Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 598 (E.D. Va. 2013) ("[O]perating a website available on the Internet is not equivalent to use in United States commerce."); *see also Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 326 (4th Cir. 2015) (providing information on a website "without any commercial or transactional component is speech—nothing more" and does not constitute "use" in commerce under the Lanham Act).

*Second*, Simply Wireless's alleged sales through Amazon.com and www.simplyprepaid.com in 2015-2017 are similarly insufficient to establish an intent to resume use more than three years prior.[15]  Indeed, Simply Wireless made no effort to tie those alleged sales to conduct during the statutory period.

---

[15] As the district court noted, Steven Qureshi could not confirm whether products and services purportedly sold on Amazon.com were ever advertised as "Simply Prepaid" products and services.  JA1792 n.27; *see also* JA2070-2071.  And Simply

***Third***, Simply Wireless's suggestion that this lawsuit—purported evidence that it "takes its trademark rights seriously"—evinces its intent to resume use is also misplaced. Br. 43. Unsurprisingly, the case Simply Wireless cites provides no support for this circular proposition. In *Ogden v. Cozumel, Inc.*, No. A-18-CV-00358-LY, 2019 WL 4144324 (W.D. Tex. Aug. 29, 2019), the court credited the mark holder's active litigation for control of the mark ***during the statutory period*** as evidence of intent to resume use. *Id.* at *8. That is a far cry from Simply Wireless's conduct here, where it initiated this lawsuit long after the statutory period.

### B. There Is No Dispute That Simply Wireless's Sporadic And Transitory Sales Between July 31, 2012 and April 25, 2013 Failed To Re-Establish Common Law Rights To "Simply Prepaid."

The district court found—and Simply Wireless does not appear to dispute—that Simply Wireless's $15,546 in sales between July 31, 2012 and April 25, 2013—"was not the kind of continuous, uninterrupted use necessary to revive … lost rights in [a] mark." JA1795. Thus, as the district court correctly concluded, once Simply Wireless abandoned any rights it had in "Simply Prepaid" in 2011, it failed to reestablish common law rights before T-Mobile's first use in June 2014.

---

Wireless repeatedly refused to provide ***any*** evidence corroborating what products it sold on Amazon.com or their display. JA2898-2899.

"Once a mark is abandoned, it returns to the public domain, and may be appropriated anew." *Specht*, 747 F.3d at 935; *see, e.g.*, *McCarthy on Trademarks* § 17:3 ("Once a period of nonuse results in abandonment, a resumption of use thereafter cannot cure the preceding abandonment. Such a resumption represents a new and separate use with a new date of first use."). Thus, a party seeking to re-establish common-law trademark rights in an abandoned mark must establish exclusive use that is "deliberate and continuous, not sporadic, casual or transitory." *Larsen*, 151 F.3d at 146 (internal quotations omitted).

Here, Simply Wireless's limited and fleeting alleged use of "Simply Prepaid" to generate $15,546 in sales on www.toptvstuff.com between July 2012 and April 2013 "was insufficient to establish a new protectible interest in the SIMPLY PREPAID mark." JA1795. Simply Wireless does not dispute this aspect of the district court's opinion, and may not do so in its reply. *See, e.g.*, *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 249 (4th Cir. 2013) ("It is a well settled rule that contentions not raised in the argument section of the *opening brief* are abandoned." (cleaned up)); *cf.* Simply Wireless Br. 40-41 (acknowledging that Simply Wireless's use "would not be sufficient to establish new trademark rights"). And in any event, as discussed in further detail below (*infra* p. 47-60), any use of "Simply Prepaid" was both not continuous—there was a fifteen month break in use between Simply Wireless's last alleged use in April 2013 and T-

- 45 -

Mobile's first use in June 2014—and not the type of widespread ***bona fide***
commercial use giving rise to common law rights.  *See* JA928 (Aug. 20, 2012
email from Ignite Media to Simply Wireless discussing "initial testing budget" and
explaining that this initial testing would not be profitable); *see also, e.g.*, *The Hub,
Inc. v. Manhattan-Ward, Inc.*, 673 F. Supp. 770, 771 (W.D. Va. 1987) ("Under
existing law, [Plaintiff] must establish significant market penetration into a given
area[.]" (citing *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383
(3rd Cir. 1985))); *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921
F.2d 467, 473 (3d Cir. 1990) (finding insufficient market penetration when mark
holder "had failed to establish sales above $5,000 per year or a total of over 50
customers for any one year"); *La Societe Anonyme*, 495 F.2d at 1272 (noting that
"a meager trickle of business" does not constitute "the kind of bona fide use
intended to afford a basis for trademark protection").  This is precisely the type of
"sporadic, casual or transitory" use this Court has held is insufficient to establish
common-law trademark rights.  *Larsen*, 151 F.3d at 146.

Finally, Simply Wireless's internal communications in May 2014, *see*
JA933-934, are not commercial use of a mark giving rise to trademark rights.  *See,
e.g.*, *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1360 (Fed. Cir. 2009)
("[A]n applicant's preparations to use a mark in commerce are insufficient to
constitute use in commerce."); *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260,

1266 (5th Cir. 1975) ("To acquire trademark rights there has to be an 'open' use,

that is to say, a use has to be made to the relevant class of purchasers or

prospective purchasers … . '[I]nternal use … cannot give rise to trademark

rights." (quoting *Sterling Drug, Inc. v. Knoll A.-G. Chemische Fabriken*, 159

U.S.P.Q. 628, 631 (T.T.A.B. 1968))).

## III.   THE DISTRICT COURT'S JUDGEMENT CAN ALTERNATIVELY BE AFFIRMED BECAUSE SIMPLY WIRELESS CANNOT ESTABLISH COMMON LAW OWNERSHIP OF "SIMPLY PREPAID."

The district court's grant of summary judgment in T-Mobile's favor can

alternatively be affirmed because Simply Wireless cannot establish common law

ownership of "Simply Prepaid" prior to T-Mobile's first use.  A plaintiff asserting

infringement of an unregistered mark has the burden to prove that (1) the claimed

mark is distinctive; and (2) it has the "exclusive right to use the mark by actual use

in a given territory."  *Emergency One, Inc. v. American Fire Eagle Engine Co.*,

332 F.3d 264, 269 (4th Cir. 2003) ("*Emergency One II*").  This Court has

explained that, to meet that latter requirement, the owner of the alleged common

law trademark must show (1) "prior appropriation," i.e., first use, *id.*, and (2)

"***deliberate and continuous***" use, *Larsen*, 151 F.3d at 146 (emphasis added)

(internal quotations omitted).

Although the district court found that "the 'deliberate and continuous' test

applies only to the initial accrual of trademark rights, not whether a common law

owner has maintained such rights," JA1786, numerous courts have determined that

the "continuous use" requirement extends to the point at which the purported

owner of a common-law mark seeks to exclude others from use of the mark. *See,*

*e.g.*, *Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 219 (3d Cir. 2021) ("With

respect to ownership of an unregistered mark, the first party to adopt a mark can

assert ownership ***so long as it continuously uses the mark in commerce***." (quoting

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438

(3d Cir. 2000)) (emphasis added) (cleaned up)); *Airs Aromatics LLC v. Victoria's*

*Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) ("To establish

a protectible ownership interest in a common law trademark, the owner must

'establish not only that he or she used the mark before the mark was registered, ***but***

***also that such use has continued to the present***.'" (emphasis added) (quoting

*Watec Co. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005))); *Tally-Ho, Inc. v. Coast*

*Cmty. College Dist.*, 889 F.2d 1018, 1022-1023 (11th Cir. 1989) ("[A]ctual and

continuous use is required to acquire and retain a protectible interest in a mark.");

*La Societe Anonyme*, 495 F.2d at 1271-1272 ("To prove bona fide usage, the

proponent of the trademark must demonstrate that his use of the mark has been

deliberate and continuous, not sporadic, casual or transitory");[16] *Blue Bell*, 508

---

[16] While *La Societe Anonyme* discusses continuous use in the context of whether
the purported trademark owner accrued trademark rights*, see* JA1785, the decision

F.2d at 1265 ("[E]ven a single use in trade may sustain trademark rights *if followed by continuous commercial utilization*.").[17]  This Court should reach the same conclusion.

Were continuous use only to apply to the initial use of the mark, a party asserting common law trademark rights could sporadically use an unregistered mark at one point in time and then seek to prevent another's bona fide use at a later time when its own use has long expired.  This is antithetical to the core purpose of trademark law.  "[T]he right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property *except in connection with an existing business*." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) (emphasis added).  Allowing a party to own rights to common words in the English language by means of an unused and unregistered trademark would permit companies to exclude others from use of those words even without a connection to an existing business.

---

explicitly notes that to establish ownership, the use must be continuous through the alleged infringement.  *See* 495 F.2d at 1272.

[17] While the *Blue Bell* Court awarded common law ownership to the first user, there was no dispute that both parties engaged in continuous use.  508 F.2d at 1262 ("Both parties market their goods on a national scale …. Thus, the only question presented for our review is which party established prior use ….")

Such an approach would also disincentivize use of the trademark registry and create broader confusion in trademark disputes. When a company registers a trademark, that act creates a presumption of validity and shifts the burden to the party challenging validity of the mark. *See Emergency One II*, 332 F.2d at 268 (quoting 15 U.S.C. § 1057(b)). And in the case of registered, incontestable marks under 15 U.S.C. § 1115—i.e., marks registered for more than 5 years for which the owner has filed an affidavit of incontestability, *see* 15 U.S.C. § 1065—this presumption of validity becomes conclusive, with only a limited number of defenses against validity remaining under 15 U.S.C. § 1115(b), including abandonment. In exchange, by registering a mark, a trademark owner puts every business in the country on notice that it claims ownership of certain words in connection with its business. Those businesses are then able to easily check the trademark registry to assess what words and phrases are foreclosed from trademark use.

Where a mark is not registered, however, companies believing that no other party had adopted a mark could invest substantial resources into use of the mark in connection with a business, only to see those efforts wasted when an alleged prior user asserts rights to an unused mark. As occurred here (*supra* p. 14), a company might check the trademark registry and public records, find no evidence of use of a mark, and launch a product line, *see* JA2749-2861 (showing the trademark

searches T-Mobile conducted that showed no use of the term "Simply Prepaid"),
before suddenly facing a plaintiff looking to obtain a significant monetary recovery
by asserting an unused and discarded mark.  For that reason, courts have
recognized that the standard for proving ownership of an unregistered mark in an
infringement action is stricter that the standard for proving ownership for
registration purposes.  *See, e.g.*, *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 986
F. Supp. 253, 258-259 (D. Del. 1997) ("The 'use' that satisfies the registration
requirement may not be sufficient 'if [the] owner seeks to use the mark to stifle the
efforts of others.'  Thus, the standard for determining which activities will
establish ownership of a trademark without registration is much stricter than the
standard for determining whether a mark is registrable." (internal citations
omitted)), *aff'd*, 186 F.3d 311 (3d Cir. 1999).

Based on this understanding, multiple courts have recognized that an alleged
common law mark owner must establish continuous use of the mark up to the time
of the alleged infringer's use.  *See, e.g.*, *Herb Reed Enters., LLC v. Florida Entm't
Mgmt., Inc.*, 2:12-cv-00560–MMD, 2014 WL 1305144, at *4 (D. Nev. Mar. 31,
2014) ("The Court does not agree … that demonstrating Reed did not abandon the
mark is sufficient to establish continuous use.  Were the two standards
synonymous, establishing a single-instance of use, and thus negating abandonment,
would satisfy the requirements for continuous use."); *Spin Master, Ltd. v.*

- 51 -

*Zobmundo Entm't, LLC,* 944 F. Supp. 2d 830, 851-852 (C.D. Cal. 2012) (noting that "the inquiry into common law priority is not controlled by the requirements of abandonment" because "requiring a showing of abandonment would shift the burden to the party challenging priority");[18] *see also International Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,* 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007) ("IHE's proffered evidence is insufficient to show use in commerce of its marks because the evidence demonstrates no deliberate and continuous actual or analogous use of the marks in the ordinary course of trade."); *McDonald's Corp. v. Burger King Corp.,* 107 F. Supp. 2d 787, 790 (E.D. Mich. 2000) ("Viewing the evidence in the light most favorable to McDonald's, the court finds that McDonald's has failed to set forth or identify specific facts showing a genuine triable issue regarding whether its use was deliberate and continuous or only sporadic, casual or transitory.").  The Ninth Circuit has similarly explained that continuous use requires regular use by the purported common law mark holder up to the alleged infringement.  *Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709, 712 (9th Cir. 1974); *Airs Aromatics*, 744 F.3d at 599

---

[18] As this Court has explained, in common law infringement actions, the purported owner of the mark bears the burden of establishing both ownership and validity. *See Emergency One II*, 332 F.3d at 269 ("[A] user claiming ownership of a mark under common-law principles does not enjoy the benefit of the presumptions conferred by registration and must establish his right to exclusive use.")

("To establish a protectible ownership interest in a common law trademark, the owner must establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present." (internal quotation marks omitted)).

To the extent Simply Wireless argues that *Emergency One I*, *Emergency One II*, and *Larsen* suggest continuous use is not required to establish common law trademark rights, *see* JA1784-1786, that argument should be rejected. None of those cases deal with the continuous use requirement or hold that common law trademark ownership should be assessed only through the lens of abandonment. Moreover, as discussed above, cases that have explicitly addressed that issue have reached the opposite conclusion.

In *Larsen*, this Court found that the sale of 11,000 CDs satisfied the Lanham Act's use requirement 18 months prior to the filing of a lawsuit, thereby entitling the plaintiff's common law trademarks to protection. 151 F.3d at 143-144. There was no need for *Larsen* to discuss continuous use because the facts of the case clearly demonstrated the trademark owners' continuous use of the mark. The defendant, who held domestic distribution rights for a Danish plaintiff, was selling counterfeit versions of the plaintiff's products while refusing to market the true product, even though the plaintiff continually encouraged the defendant to do so. *Id.* at 143-144. Under those circumstances, the defendant could not credibly claim

that the plaintiff had failed to continuously use the mark prior to the alleged infringement.

Similarly, far from rejecting a continuous use requirement, *Emergency One I* focused on abandonment because the parties **stipulated** to trying the case solely on that issue. *See Emergency One I*, 228 F.3d at 533 ("Pre-trial stipulations narrowed the case to a single issue: Had E–One abandoned the AMERICAN EAGLE mark?"). In *Emergency One II*, the issue was the geographic extent of common law trademark rights, not continuous use or abandonment. *See Emergency One II*, 332 F.3d at 267-273. While the district court correctly noted *Emergency One II*'s holding that "trademark ownership is acquired by actual use of the mark in a given market," *see* JA1785 (citing *Emergency One II*, 332 F.3d at 267), this Court in *Larsen* specifically defined "'[u]se' within the meaning of the Lanham Act … as bona fide commercial use … [that is] 'deliberate and continuous, not sporadic, casual or transitory,'" 151 F.3d at 146. Indeed, the paragraph in *Emergency One II* that refers to "first to actually use" directly cites to the Sixth Circuit's decision in *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100 (6th Cir. 1991), which explicitly identified "**continuous use of the service mark**" as a "requirement[] necessary to make out a claim for infringement." *Id.* at 1105 (emphasis added). Thus, rather than rejecting the continuous use requirement for ownership, this Court implicitly reaffirmed it.

Nor does *George Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 400-401 (4th Cir. 2009), suggest that continuous use is not required. *See* JA1786. Although *George* addressed abandonment, it nonetheless noted the continuous use requirement, explaining that "so long as a person is the first to use a particular mark to identify his goods in a given market, and ***so long as that owner continues to make use of the mark***, he is entitled to prevent others from using the mark." *Id.* at 400 (emphasis added and internal quotation marks omitted).

To the extent Simply Wireless relies on *Callmann on Unfair Competition*'s statement that "gaps in use are irrelevant unless they constitute abandonment," *see* JA662 (citing 4 *Callmann on Unfair Competition, Trademarks, and Monopolies* § 20:7 (4th ed.)), to argue that abandonment is the only relevant inquiry, courts have rejected that argument. *See*, *e.g.*, *Herb Reed Enterprises*, 2014 WL 1305144, at *4; *Spin Master*, 944 F. Supp. 2d at 851-852. Indeed, the cases relied upon in *Callmann* are readily distinguishable; each was decided in the context of ***registration disputes*** applying 15 U.S.C. § 1052(d), which governs registrability of marks. *See*, *e.g.*, *West Florida Seafood, Inc. v. Jet Restaurants, Inc.*, 31 F.3d 1122, 1128 (Fed. Cir. 1994) (finding that the Trademark Trial and Appeal Board erred in failing to apply the standard for registration under § 1052(d)). Under § 1052(d), the PTO shall not register a mark if it is "a mark or trade name previously used in

the United States by another and **not abandoned**."  15 U.S.C. § 1052(d) (emphasis added).

The question here is not whether Simply Wireless is entitled to **register** "Simply Prepaid" under § 1052(d).  Rather, Simply Wireless must demonstrate that it has common law ownership rights to an **unregistered** "Simply Prepaid" mark, which requires it to establish continuous use.  Indeed, multiple courts have recognized that, unlike the standard used to determine registrability, a higher burden applies where a party asserts a common law mark to preclude others from using the mark.  *See*, *e.g.*, *La Societe Anonyme*, 495 F.2d at 1271 ("Adoption and a single use of the mark may be sufficient to entitle the user to register the mark[, b]ut more is required to sustain the mark against a charge of nonusage" (internal citations omitted)); *McDonald's Corp.*, 107 F. Supp. 2d at 789-790 ("[T]he showing necessary to support a common law trademark right is even higher when, as in this case, the plaintiff is seeking to stifle the efforts of others to use a similar mark." (internal citations omitted)).

Here, there is no genuine dispute that Simply Wireless cannot show continuous use of "Simply Prepaid," and thus has failed to establish common-law ownership as a matter of law.  Simply Wireless failed to make **any** use of Simply Prepaid between at least 2009 and July 31, 2012; between April 25, 2013 and October 4, 2015; and from March 31, 2018 to the present.  As discussed above

- 56 -

(*supra* p. 10-11), Simply Wireless made the strategic decision to cease use of the term "Simply" altogether in 2009, rebranding SIMPLY WIRELESS-branded stores to "Mobile Now" stores as part of an exclusive—and ultimately, lucrative— agreement with Sprint, *see* JA2030-2031; JA2043; JA2044, and shifting non-brick-and-mortar channels of trade to operating under "Wireless Partners," *see* JA2056-2059; JA3369. Indeed, when T-Mobile first began using "Simply Prepaid," Simply Wireless was not using "Simply Prepaid" at all and undisputedly had not done so for nearly fifteen months. JA1792. That is precisely the type of "sporadic, casual or transitory" use, *Larsen*, 151 F.3d at 146, that defeats continuous use and common law trademark rights. *See*, *e.g., Casual Corner Assocs*., 493 F.2d at 712 (one year of non-use broke continuity of use); *Spin Master,* 944 F. Supp. 2d at 852 (two years of non-use broke continuity of use).

Indeed, as shown below, based on Simply Wireless's own summary spreadsheet, it stopped operating under the "Simply Wireless" (yellow) and "Simply Prepaid" (blue) names, ceasing any meaningful use of the term "Simply," while generating hundreds of millions of dollars in revenue through the "Mobile Now" business (green)—demonstrating its considered decision to shift toward activities not involving "Simply Prepaid."



JA639; *see also* JA638; *supra* p. 17-18.

Because there is no genuine dispute that Simply Wireless did not make

continuous use of "Simply Prepaid" up until T-Mobile's first use, this Court should

find that Simply Wireless cannot establish common law ownership of a "Simply

Prepaid" mark as a matter of law, and affirm the district court's judgment on this

alternative basis.[19]

---

[19] Simply Wireless also cannot establish common law rights in any particular
geographic market. "[C]ommon law rights are restricted to the locality where the
mark is used and to the area of probable expansion." S*partan Food Sys., Inc. v.
HFS Corp.*, 813 F.2d 1279, 1282 (4th Cir. 1987). Establishing the geographic
boundaries of a common law mark "is critical to a viable claim." *Stat Ltd. v. Beard
Head, Inc.*, 60 F. Supp. 3d 628, 633 (E.D. Va. 2014). Not only is Simply Wireless
unable to establish rights in any particular geographic area between 2002 and 2008
(*see supra* p. 5-8), but later alleged sales through www.toptvstuff.com are legally
insufficient to establish market penetration in any market, as even the state with the
most sales (Florida) involved only 36 sales to 30 customers and only $2,143.71 in

# CONCLUSION

For the foregoing reasons, T-Mobile respectfully requests that this Court affirm the district court's grant of summary judgment in favor of T-Mobile.

Respectfully submitted,

/s/ Joseph J. Mueller

BRITTANY BLUEITT AMADI
JOSS BERTEAUD
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
brittany.amadi@wilmerhale.com
joss.berteaud@wilmerhale.com

GIDEON A. HANFT
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
gideon.hanft@wilmerhale.com

June 13, 2023

JOSEPH J. MUELLER
MICHAELA P. SEWALL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
joseph.mueller@wilmerhale.com
michaela.sewall@wilmerhale.com

*Attorneys for Defendants-Appellees*

---

revenue. JA1701; JA3377-3430; *see, e.g., Charles Jacquin Et Cie*, 921 F.2d at 473 ("[W]e need only consider market penetration in two states outside of New Jersey, since the clothing manufacturer had failed to establish sales above $5,000 per year or a total of over 50 customers for any one year in any other states.").

## STATEMENT REGARDING ORAL ARGUMENT

T-Mobile respectfully requests this Court to hear oral argument in this case.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,991 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Joseph J. Mueller
JOSEPH J. MUELLER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

June 13, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Joseph J. Mueller
JOSEPH J. MUELLER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

June 13, 2023